12 F.3d 394
 Gregory HOUCK and Pamela Houck, Individually and as Parents
and Natural Guardians on behalf of Benjamin Houck,
a Minor, Appellants,
v.
Denis S. DRUMMOND, M.D., Lee S. Segal, M.D., Henry T. Lau,
Children's Hospital of Philadelphia, Surgical Associates of
the Children's Hospital of Philadelphia, Ltd., Children's
Surgical Associates, Ltd., and University of Pennsylvania, Appellees.
 No. 93-1130.
 United States Court of Appeals,
Third Circuit.
 Argued Sept. 28, 1993.
Decided Dec. 14, 1993.
As Amended Dec. 20, 1993.
Sur Petition for Rehearing Jan. 6, 1994.
 
 William J. Taylor (argued) and Matthew A. Taylor, Taylor & Taylor, Philadelphia, PA, for appellants.
 Bart C. Tuttle (argued) and Lizabeth Ann Boyle, O'Brien & Ryan, Plymouth Meeting, PA, for appellees Denis Drummond, M.D., Surgical Associates of the Children's Hosp. of Philadelphia, and Children's Surgical Associates.
 David C. Federman (argued) and Anna M. Schmidt, White & Williams, Philadelphia, PA, for appellees Lee S. Segal, M.D., and Children's Hosp. of Philadelphia.
 Before: SCIRICA, ALITO, and SEITZ, Circuit Judges.
 OPINION OF THE COURT
 SEITZ, Circuit Judge.
 
 
 1
 Gregory and Pamela Houck, individually, and as the parents and natural guardians of Benjamin Houck (the "Houcks"), appeal the district court's order denying them a new trial and entering judgment for Dr. Denis S. Drummond, Dr. Lee S. Segal, Children's Hospital of Philadelphia, Surgical Associates of the Children's Hospital of Philadelphia, and Children's Surgical Associates ("defendants," unless individual designation is required).[1] The district court had diversity jurisdiction under 28 U.S.C. Sec. 1332. This court has jurisdiction over an appeal of the final judgment of the district court under 28 U.S.C. Sec. 1291.
 
 Factual Background
 
 2
 Benjamin Houck ("Ben") was born with a defect that caused his left thigh bone to bow. After his family moved to West Orange, New Jersey, his parents took him to see the defendant, Dr. Denis Drummond, the Chief of Orthopedic Surgery at Children's Hospital of Philadelphia, about correcting his condition.
 
 
 3
 Defendant Dr. Lee Segal, a post-residency fellow training under Dr. Drummond, first examined Ben and participated in most or all of the meetings with Dr. Drummond thereafter. When Ben was three years old, Dr. Drummond and Dr. Segal performed an osteotomy[2] on his left femur to straighten the leg. During the course of the operation, the superficial femoral artery and vein in the leg either ruptured or were cut. Defendant Dr. Henry Lau, a vascular surgeon, required several hours to repair the damage, which turned out to be permanent.
 
 
 4
 In their complaint the Houcks asserted claims for negligence, lack of informed consent, and fraud against the defendants. More particularly, they claimed that the doctors' negligence in failing to isolate the blood vessels resulted in the injury, that Dr. Drummond did not adequately warn them of the possibility that the vessels could be severed, that they did not consent to Dr. Segal's participation in the operation, and that Dr. Drummond defrauded them by misrepresenting who would perform the surgery.
 
 
 5
 At the close of the jury trial, the district court delivered its instructions. The instructions referred to the verdict sheet to be used by the jury to record its decision on the claims.
 
 
 6
 After the district court gave its instructions to the jury, it asked counsel for comments or objections. The Houcks' counsel listed ten previously numbered requested instructions without elaboration. The district court responded to each, "I'll stand on the charge."
 
 
 7
 The jury found for the defendants on all claims. Thereafter, the court denied the Houcks' motion for a new trial. The Houcks appeal the judgment of the district court only to the extent that it is based on the jury's finding in defendants' favor on the informed consent issue (including procedural and evidentiary issues).
 
 Informed Consent Instruction
 
 8
 The Houcks claim on appeal that the district court erred under Pennsylvania law in instructing the jury that it must determine "whether the failure to obtain informed consent was a substantial factor in causing the injuries to plaintiffs." Defendants respond at the outset that the Houcks did not preserve this objection for appeal because they did not reasonably and timely communicate their grievance to the district court. See Fed.R.Civ.P. 51. Because the resolution of the issue is not of ultimate significance, we shall assume without deciding that the objection was preserved and turn to the merits of the issues presented.
 
 
 9
 The jury instruction attacked by the Houcks reads as follows:
 
 
 10
 "If you find that there was no such informed consent, then you must determine whether that failure was a substantial factor in causing the injuries."
 
 
 11
 The Houcks say the "substantial factor" requirement in the instruction is contrary to Pennsylvania law. It is obvious, however, that this instruction made clear to the jury that the causation issue need only be addressed if it first decided that there was no informed consent.
 
 
 12
 We emphasize at the outset that the jury took the verdict sheet into the jury room with them. The court's initial instruction with respect to the negligence claim made it clear to the jury that there were two questions to be answered on the verdict sheet, viz., whether there was negligence on the part of the defendants and whether it was a substantial factor in causing Ben's injuries.
 
 
 13
 In contrast, the question on informed consent on the verdict sheet did not refer to any substantial causation requirement. It simply asked whether the two doctors improperly failed to obtain the informed consent of the plaintiffs, to which the jury answered in the negative. We think the court was there employing the "informed consent" language in the same sense that it was used in its instructions to the jury. Consequently, when the jury found in the negative on informed consent, the causation issue became irrelevant. Thus, we are not called upon to decide whether that portion of the instruction was erroneously given here. See Gouse v. Cassel, 532 Pa. 197, 615 A.2d 331 (1992).
 
 
 14
 We, therefore, conclude that there was no reversible error in the controlling portion of the jury instruction.
 
 Admission of the Consent Forms
 
 15
 Preliminarily, the defendants could not find any consent form executed by the Houcks for the March 6 operation. A form was offered by defendants that was represented to be defendants' standard consent form. The Houcks attack the district court's refusal to grant a new trial based on its admission into evidence, over objection, of a blank consent form that was in use at Children's Hospital of Philadelphia during the relevant time period. "Where a motion for a new trial is based on the admissibility of evidence, the 'trial court has great discretion ... which will not be disturbed on appeal absent a finding of abuse.' " Link v. Mercedes-Benz of North Am., Inc., 788 F.2d 918, 921-22 (3d Cir.1986), (quoting Kane v. Ford Motor Co., 450 F.2d 315, 316 (3d Cir.1971)).
 
 
 16
 The Houcks claim that the blank consent form was irrelevant to establish to whom consent was given. However, the Houcks agreed that one of them executed a consent form for the surgery. Thus, the form was properly admitted as relevant evidence of the contents other than the blanks.
 
 
 17
 The Houcks also make a relevance objection to the consent form executed by Mr. Houck for the May surgery to remove the pins placed in Benjamin's leg during the March surgery. This form was relevant to impeach Mr. Houck after he denied familiarity with the consent form used by the hospital. The objection is without substance.
 
 
 18
 The Houcks raise other arguments against the admission of the blank consent forms, but we are unable to locate in the record any indication that these objections were presented for the district court's consideration. As a general rule, we do not consider such objections for the first time on appeal. Althouse v. Resolution Trust Corp., 969 F.2d 1544, 1547 (3d Cir.1992). We see no basis for making an exception here.
 
 Factual Sufficiency
 
 19
 Finally, the Houcks contend that the jury finding that Dr. Segal did not fail to obtain informed consent, i.e., had a defense to battery, is against the great weight and preponderance of the evidence and that the district court therefore abused its discretion by denying their motion for new trial. The district court should have granted the motion for new trial as to the fact question only if a miscarriage of justice would have resulted if the verdict were to stand and should not have substituted its judgment for the jury's. EEOC v. Delaware Dep't of Health & Social Servs., 865 F.2d 1408, 1413 (3d Cir.1989). After a review of the record, we find no abuse of discretion by the district court in denying the motion.
 
 Conclusion
 
 20
 The district court's judgment and its order denying the Houcks' motion for a new trial will be affirmed.
 
 ALITO, Circuit Judge, dissenting:
 
 21
 I respectfully dissent. In my view, the district court gave an erroneous jury instruction on informed consent; the plaintiffs properly preserved their objection to that instruction; and the error was not harmless. Accordingly, I would reverse and remand for a new trial on informed consent.
 
 
 22
 Under Pennsylvania law, a physician who operates without consent commits a battery and is liable for any injuries proximately caused by the operation. Gouse v. Cassel, 532 Pa. 197, 202-04, 615 A.2d 331, 333-34 (1992); Gray v. Grunnagle, 423 Pa. 144, 166, 223 A.2d 663, 674 (1966). The physician's liability is not limited to the injuries proximately caused by the lack of consent. Thus, if a patient consented to an operation by physician A, but physician B actually performed the operation, the physicians could not defend themselves by arguing that the lack of consent did not proximately cause the patient's injuries because those injuries would have occurred even if physician A had performed the operation.
 
 
 23
 Here, the plaintiffs requested that the district court give an instruction based on Pennsylvania Standard Jury Instruction, Civil Sec. 10.06, which correctly sets out the legal principles noted above.[1] The district court did not conduct a charge conference. Instead, the court told counsel that he would cover their requested instructions "in [his] own words" and that he would "see counsel at side bar after [he had] charged the jury to hear any objections that they have to the charge." App. at 693a. The court added without elaboration: "I will submit to the jury whether Doctors Drummond and Segal improperly failed to obtain the informed consent of the plaintiffs." Id.
 
 
 24
 In instructing the jury, the court began by reviewing the verdict sheet. For present purposes, two questions on the verdict sheet are important. Question 3 asked: "Did either [Dr. Drummond or Dr. Segal] improperly fail to obtain the informed consent of the plaintiffs?" App. at 771a. Question 6 asked: "What compensatory damages do you award the plaintiffs?" Id. at 772a. The court subsequently focused on Question 3 and stated the following:
 
 
 25
 Now let me explain to you about informed consent which is Question 3.
 
 
 26
 A physician must obtain a patient's informed consent to perform health care services upon that patient. A physician who medically treats a patient without informed consent commits battery and is liable for all injuries the patient suffers as a result of that treatment regardless of the care.
 
 
 27
 There are two parts to the informed consent.
 
 
 28
 First, the physician is bound to disclose to the patient all of those facts which a reasonable man in a situation which the doctor knew or should have known to be his patient's situation would consider important in his decision whether to undergo treatment.
 
 
 29
 This standard requires a doctor to inform a patient of the nature of the proposed procedures and of the risks involved in that treatment. Alternative methods of treatment should be disclosed and the second part of informed consent is that after the patient has been given all of this information, the patient must agree to the treatment.
 
 
 30
 If you find that the [sic] there was no such informed consent, then you must determine whether that failure was a substantial factor in causing the injuries.
 
 
 31
 So as to Question 3, you must determine whether the two physicians obtained the informed consent of the parents of Benjamin Houck before performing the operation and you answer that yes or no depending on what you find in that regard.
 
 
 32
 Now on to Question 4....
 
 
 33
 Id. at 777a-78a.
 
 
 34
 In my view, the highlighted portion of this instruction is contrary to the legal principles discussed above. Under this instruction, a physician who operates without consent is not liable for all of the injuries proximately caused by the operation, as Pennsylvania law provides, but only for those injuries proximately caused by the lack of informed consent. Thus, under this instruction, if a patient consented to an operation by physician A but physician B actually performed the operation, the physicians could defend themselves by arguing that the lack of informed consent did not proximately cause the patient's injuries because those injuries would have occurred no matter which physician performed the operation. While the district court provided an accurate explanation of the relevant legal principles in an earlier portion of its charge,[2] I believe that the charge, taken as a whole, had a substantial potential to mislead the jury, particularly in light of the evidence on informed consent, which I discuss below. See Bennis v. Gable, 823 F.2d 723, 727 (3d Cir. 1987); Link v. Mercedes-Benz of N. Am., Inc., 788 F.2d 918, 922 (3d Cir. 1986).
 
 
 35
 After the judge had completed the instructions, plaintiffs' counsel again asked that the court give a number of the instructions that he had previously requested, including the instruction based on Pennsylvania Standard Jury Instruction, Civil Sec. 10.06, but in each instance the court responded without further explanation: "I'll stand on the charge." App. at 785a. In fact, the court responded with that same phrase to virtually every request or objection concerning the instructions made by any attorney. See id. at 785a-87a. Under these circumstances, I believe that the plaintiffs sufficiently preserved their objection to the court's instruction concerning informed consent.
 
 
 36
 The majority does not hold that the court's instruction was correct or that the plaintiffs failed to preserve their objection. Without reaching those questions, the majority concludes that any error in the instruction did not affect the jury's verdict. Noting that the portion of the instruction in question concerns causation, the majority reasons that "when the jury found in the negative on informed consent, the causation issue became irrelevant." Maj. at 397. I am unable to agree with this reasoning because, as I believe the excerpt from the jury instructions quoted above makes clear, the error occurred during the portion of the instructions devoted to Question 3, which concerned informed consent, not Question 6, which concerned compensatory damages. Just before giving the erroneous instruction, the court stated: "Now let me explain to you about informed consent which is Question 3." App. at 777a (emphasis added). And just after giving the erroneous instruction, the court summarized: "So as to Question 3 ..." and then stated: "Now on to Question 4." Id. at 778a.
 
 
 37
 Finally, I do not think that the error in the jury instruction was harmless. The evidence that the Houcks consented to have Dr. Segal perform the operation on their child was, in my view, thin. Indeed, were it not for the inferences that the jury was permitted to draw concerning a consent form that one of the Houcks might have signed, I would conclude that the Houcks were entitled to judgment as a matter of law. Although unable to produce any signed consent form for the operation in question, the hospital did introduce a copy of the form that it customarily used, and this form authorized surgery by the named physician "and whomever he/she may designate." In addition, the Houcks testified that they signed some forms prior to the operation. App. at 157a, 568a. Thus, the jury could have rationally concluded that the Houcks signed a copy of the hospital's standard consent form and that this form authorized surgery by Dr. Drummond or his designee, Dr. Segal.
 
 
 38
 There was, however, strong evidence that the Houcks had orally conditioned their consent on the performance of the surgery by Dr. Drummond himself. The Houcks specifically sought out Dr. Drummond on the recommendation of a physician in Ohio, and both parents, while acknowledging that they had been aware that Dr. Segal would be present during the operation (App. at 191a, 576a-77a), nevertheless testified emphatically that Dr. Drummond orally promised them that he would perform the surgery himself. Mrs. Houck testified as follows:
 
 
 39
 Q. Was there any discussion between you and Dr. Drummond about who was going to operate?
 
 
 40
 A. Yes, there was. We always wrote down a lot of questions before we went to talk to the doctor and one of the questions I asked him, I said, will you, yourself, perform this surgery. And he promised me that he would.
 
 
 41
 Q. Had he not given you that promise, would you have allowed Ben to be operated on?
 
 
 42
 A. No.
 
 
 43
 App. at 155.
 
 
 44
 On cross-examination, she testified as follows:
 
 
 45
 Q. Is it fair to say that you had asked Dr. Drummond if he was going to do the surgery and he said he was going to be the surgeon?
 
 
 46
 A. He promised me he would be the one to do it.
 
 
 47
 Q. And he used the word "promise"?
 
 
 48
 A. Yes.
 
 
 49
 Q. Is that what he said? He said: "I promise you?"
 
 
 50
 A. He said: "I will do it."
 
 
 51
 Id. at 192a.
 
 Similarly, Mr. Houck testified as follows:
 
 52
 Q. Were you there during any conversation regarding who was going to operate?
 
 
 53
 A. Yes.
 
 
 54
 Q. What was the conversation--
 
 
 55
 A. This would have been the final visit with Dr. Drummond prior to the surgery and we asked Dr. Drummond who was going to be doing the operation. In fact, we had questions written down, and one of the questions was: "Will you personally be performing the operation?" And he said: "Yes, I will."
 
 
 56
 .....
 
 
 57
 Q. And did it ever occur to you or did anyone ever give you any information while you were there that would lead you to believe that someone else would do any of--could do any of the cutting?
 
 
 58
 A. No, not at all.
 
 
 59
 Q. Did it ever occur to you that a fellow or a trainee would do the cutting?
 
 
 60
 A. That had never crossed our minds. Our concern was that one of the other staff surgeons would do it. It didn't even enter our minds that a resident or someone else would do it.
 
 
 61
 Id. at 548a-49a.
 
 
 62
 Dr. Drummond was unable to testify that these conversations did not occur. He stated that he did not recall any such discussion (App. at 314a), but he did testify concerning his customary practice when parents asked him whether he would personally perform the surgery on their children. According to Dr. Drummond, he "[u]sually" gave them the following "line": "[W]e need help to do these complex procedures.... I can't do these procedures alone." Id. at 302a-03. He volunteered, however, "I don't go out of my way to say Dr. X is going to be here and Dr. Y is going to do this." Id. Later, he added: "If I'm asked whether I will do the surgery, I'll say yes, I'm the surgeon but I need an assistant's help." Id. at 314a (emphasis added).
 
 
 63
 The evidence at trial did not show that Dr. Drummond fulfilled the promise that, according to his testimony, he customarily gave to parents who asked whether he would personally perform the surgery on their children. The evidence did not show that he performed the surgery on Benjamin Houck with Dr. Segal's assistance. Rather, the testimony showed that Dr. Segal was the one who physically performed all or virtually all of the operation. Dr. Segal testified that he performed the incision, the exposure and approach to the femur, and the actual cutting of the femur. App. at 337a-40a. The scrub nurse corroborated this testimony. Id. at 203a-08a, 229a-32a. Even Dr. Drummond did not testify that he physically performed the operation. Instead, he said simply that he "was in charge and actively participating." Id. at 246a.
 
 
 64
 In sum, according to Dr. Drummond's own testimony, his actual role during the operation--he "was in charge and actively participating" (App. at 246a)--was quite different from what he customarily promised parents he would do--that he would be "the surgeon" but would "need an assistant's help." Id. at 314a. Consequently, I think there is a substantial danger that the court's erroneous instruction concerning informed consent affected the jury's verdict. I would therefore reverse the order of the district court with respect to the issue of informed consent and remand for a new trial on this issue.
 
 SUR PETITION FOR REHEARING
 
 65
 Jan. 6, 1994.
 
 
 66
 Present: BECKER, STAPLETON, MANSMANN, GREENBERG, HUTCHINSON, SCIRICA, COWEN, NYGAARD, ALITO, ROTH, LEWIS and SEITZ*, Circuit Judges.
 
 
 67
 The petition for rehearing filed by appellants in the above-entitled case having been submitted to the judges who participated in the decision of this Court and to all the other available circuit judges of the circuit in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular service not having voted for rehearing, the petition for rehearing by the panel and the Court in banc, is denied.
 
 
 
 [1]
 The defendant Dr. Henry T. Lau was dismissed from the case prior to trial. The appeal from the judgment in favor of the defendant University of Pennsylvania was dismissed by stipulation
 
 
 [2]
 Whether both participated in the operation was a disputed factual issue. To the extent it is of moment here, it was presumably resolved by the jury in defendants' favor
 
 
 [1]
 The requested instruction stated:
 When a patient is in possession of his or her faculties and is physically able to consult about his condition, and when no medical emergency exists, the patient's consent is legally required for the physician to be able to proceed with an invasive procedure. A physician who performs an invasive procedure without his patient's informed consent has committed a battery on his patient and is liable for any injuries caused by that battery, even though the procedure is performed with proper skill and care.
 
 
 [2]
 The court stated: "A physician who medically treats a patient without informed consent commits a battery and is liable for all injuries the patient suffers as a result of that treatment regardless of the care." App. at 777a
 
 
 *
 As to panel rehearing only